AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

10/20/2021

for the

DM

Central District of California

| FILED |
| CLERK, U.S. DISTRICT COURT |
| **10/18/2021** |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ib DEPUTY |

UNITED STATES OF AMERICA,

v.

HARUTIUN KARAPETIAN,

Defendant(s).

Case No. 2:21-MJ-04805-Duty-1

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| *Code Section* | *Offense Description* |
| 18 U.S.C. §§ 1344, 1349, 1028A | Conspiracy to Commit Bank Fraud, Aggravated Identity Theft |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s Mark Newhouse*

_____
*Complainant's signature*

Mark Newhouse, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____10/20/2021_____

_____
*Judge's signature*

City and state: _Los Angeles, California_

Alexander F. MacKinnon, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

### Count One, 18 U.S.C. § 1349

Beginning in or before 2016, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendant HARUTIUN KARAPETIAN, and others, conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344.  The object of the conspiracy was carried out, and to be carried out, in substance, as follows:  Defendant KARAPETIAN would use disguises and counterfeit identification cards to impersonate the victims of identity theft in order to obtain loans against their properties and to remove funds from their bank accounts.  Defendant KARAPETIAN would also rent under an assumed name a commercial property to receive hundreds of fraudulently obtained debit cards linked to California EDD accounts, which were used to steal unemployment benefits.  Defendant KARAPETIAN would also open business bank accounts under assumed names in order to hide the proceeds of the conspiracy by converting them into gold, and moving them abroad.  Federally-insured financial institutions defrauded as a result of this conspiracy include Bank of America, Wells Fargo Bank, Royal Business Bank, Kinecta Federal Credit Union, Hamni Bank, Industrial & Commercial Bank of China, US Bank, Bank of Hope, City National Bank, Bank of the West, and Cathay Bank.  The actual losses from this conspiracy exceed $20 million.

### Count Two, 18 U.S.C. § 1028A

Beginning in or before 2016, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendant HARUTIUN KARAPETIAN knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Bank Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

A F F I D A V I T

I, Mark Newhouse, being duly sworn and under oath, hereby depose and say as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed in this capacity since January 2005.  I am currently assigned to the FBI's Los Angeles Field Office and detailed to the FBI-led Eurasian Organized Crime Task Force ("EOCTF").  The EOCTF is comprised of federal, state, and local law enforcement agencies.  The EOCTF is responsible for, among other things, investigating violations of federal law related to money laundering, narcotics trafficking, bank fraud, identity theft, extortion, and health care fraud.

2.   I received my initial training and instruction to become a Special Agent during the 16-week-long course at the FBI Academy located in Quantico, Virginia. For example, I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, criminal complaints, and probable cause. After initial training, I was assigned to the Ventura Resident Agency ("VRA") in the Los Angeles Field Office.  I worked in that office for approximately 10 years investigating a variety of criminal and national security matters to include bank robbery, fugitives, crimes against children, wire fraud, bank fraud, espionage, counterintelligence, and offensive counterintelligence.  Following my assignment with the VRA, I was assigned to an undercover position for approximately two

years where I supported undercover operations for the FBI throughout the United States.  I am trained and certified as an Online Undercover Employee ("OCE") with the FBI.

3.    Since 2016, I have been assigned to the EOCTF operating from the Glendale Police Department ("GPD") in Glendale, California.  The mission of the EOCTF is to investigate transnational organized crime with a nexus to the eastern hemisphere of the world ("TOC-E").  I have been the affiant on warrants for searches, arrests, and wire taps on multiple TOC-E investigations involving conspiracy, wire fraud, bank fraud, identity theft, and narcotics trafficking.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely there is sufficient probable cause for the requested arrest warrant.  It does not purport to set forth all of my knowledge of the investigation into this matter.

## II.   SEEKING SEARCH AND ARREST WARRANTS

5.    This affidavit is made in support of a complaint against, and arrest warrant for, HARUTIUN KARAPETIAN for violations of Title 18, United States Code, Sections 1344, 1349, and 1028A, Conspiracy to Commit Bank Fraud and Aggravated Identity Theft.

6.    This affidavit is also made in support of warrants to search KARAPETIAN's storage unit, apartment, Odyssey van, and person for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1344, 1349, 1028A, and

1956, Bank Fraud, Conspiracy, Aggravated Identity Theft, and
Money Laundering (the "SUBJECT OFFENSES"), as described more
fully in Attachment B, which is incorporated by reference.  The
premises to be search (collectively the SUBJECT PREMISES),
described more fully in Attachments A, which are also
incorporated by reference, are:

> a.   ALLSIZE STORAGE – YORBA LINDA, 17357 LOS ANGELES
ST, UNIT 415, YORBA LINDA, CA 92886 ("the KARAPETIAN STORAGE
UNIT").

> b.   APARTMENT 218, 9009 CEDROS AVE, PANORAMA CITY, CA
91402 ("the KARAPETIAN APARTMENT").

> c.   DARK BLUE, 2003 HONDA ODYSSEY VAN ("the
KARAPETIAN ODYSSEY"), bearing California license plate number
5AWD308 and vehicle identification number ("VIN")
5FNRL18613B033740.

> d.   The person of HARUTIUN KARAPETIAN ("KARPETIAN"),
born 1956, Nevada driver's license number of 1603777657, and
California driver's license number B7464886.  KARAPETIAN is an
approximate height of five feet and nine inches, approximate
weight of 170 pounds, grey balding hair, and brown eyes.

## III. **SUMMARY OF EMPLOYMENT DEVELOPMENT DEPARTMENT FRAUD SCHEME**

7.   The EOCTF is investigating a conspiracy in the Los
Angeles area that is defrauding the unemployment insurance
benefits program offered by California's Employment Development
Department ("EDD").  The group is collectively referred to as
the "Erwin Street Crew," because they kept the vehicles they
used in their criminal scheme on Erwin Street in Van Nuys,
California.  Since at least June 2020, Erwin Street Crew co-

conspirators have engaged in a scheme to withdraw funds fraudulently obtained from debit cards containing EDD unemployment insurance benefits.  The Erwin Street Crew is suspected of applying for and obtaining fraudulent EDD unemployment insurance benefits using personal identifying information of true persons or synthetic identities.  Once approved, EDD would send a debit card, by mail, containing the unemployment insurance benefits to various addresses across the Los Angeles area.  The debit cards are provided by Bank of America.  In this fraud scheme, hundreds of debit cards were taken to various Bank of America automated teller machines ("ATM") in the Los Angeles area by co-conspirators to withdraw in cash the benefits assigned to other persons on those EDD cards.  After withdrawing as much cash as they can using scores of cards at perhaps a dozen ATMs, the conspirators leave carrying a weighted gift bag, presumably containing the illicit cash, and typically drive to one or more residences of other co-conspirators, presumably to share the proceeds or pay for the fraudulent EDD cards just depleted. Bank of America calculated the loss associated the Erwin Street Crew at approximately $23 million.  Surveillance officers identified the following members of the Erwin Street Crew as either conducting the fraudulent withdrawals, or receiving the proceeds of those withdrawals: Arman Nikogosyan, Arayik Nahapetyan, Arman Aghasinyan, Hovhannes Tumanyan, Narek Minasyan, and Gagik Sarkisjan.

**A.   KARAPETIAN IS PART OF THE ERWIN STREET FRAUD CREW**

8.   On December 2, 2020, federal search warrants were obtained by the EOCTF and served at the primary residences of

five members of the Erwin Street Crew, including Arman
Nikogosyan ("Nikogosyan").  I reviewed digital evidence seized
from Nikogosyan's devices and found evidence of over 900 EDD
cards, communications with KARAPETIAN, and several text files
that contained the personal identifying information ("PII") that
belonged to several of KARAPETIAN's victims. KARAPETIAN's role
in the EDD fraud was steal the identities of victims, obtain
fraudulent government identification in those victims' names,
and secure physical addresses in victims' names where EDD cards
and benefits could be mailed, and in some cases, obtain
fraudulent financial accounts in victims' names where EDD
benefits could be wired and subsequently laundered.

### KARAPETIAN, POSING AS GARY TOVVA, LEASED A PROPERTY THAT RECEIVED OVER $22 MILLION OF UNEMPLOYMENT BENEFITS

9.     During the investigation of the Erwin Street Crew, the
EOCTF coordinated with the Global Compliance & Operational Risk
– Fraud Rings & Analytics department at Bank of America.  Dates
and times of suspicious ATM withdraws were shared with Bank of
America who then conducted their own internal analysis for
investigative leads.  From those transactions, Bank of America
identified 1001 S Hacienda Blvd, Hacienda Heights, California,
("the Hacienda business") as an address linked to suspicious ATM
withdrawals.  Bank of America data was provided to the EOCTF for
review and analysis.  The results showed that there was a total
of 983 EDD cards sent to the Hacienda business which received a
total of $22,630,000 of unemployment benefits.  Of that total,
$18,001,621 of unemployment benefits had already been withdrawn,
by the Erwin Street Crew.

10.  After reviewing digital devices seized from Nikogosyan, I learned that Nikogosyan kept notes on his phones with various victim profiles used to further his criminal schemes.  For example, on July 23, 2020, Nikogosyan created a plain text note that listed the name, address, date of birth, social security number, telephone number, and email address for Gary Tovva. The note also identified a business "Electronic Cash System, Inc."

11.  On March 4, 2021, the EOCTF interviewed Kathy Pham, the owner of retail space located at the Hacienda business. Pham told the EOCTF that she did a physical walk-through of the Hacienda business with Tovva and a second unidentified male on July 20, 2020.  Tovva told Pham that the space would be for an HR staffing business, and he had two businesses: "Electronic Cash System, Inc," and "Metalor."  On July 27, 2020, Tovva signed a month-to-month lease for the Hacienda business with Pham and paid the first month's rent in cash.  Tovva attempted to pay the second month's rent with a business check from "Metalor" but the check did not clear, and no further payments were ever made.  Having received no additional rent payments, Pham changed the locks to the Hacienda business, but the space was later broken into around February 2021.  Pham was shown a series of photographs that included KARAPETIAN's true driver's license, a photo of KARAPETIAN wearing a wig, and a booking photo of KARAPETIAN wearing a wig and mask.  Pham identified KARAPETIAN as the man she knew as Tovva.

12.  After the interview, Pham gave a walk-through of the Hacienda business to the EOCTF.  Pham said that the space

remained in the condition that Tovva left it.  On the floor was unopened mail from EDD and Bank of America that was left in a pile.  A review of the pile identified 60 unopened envelopes from EDD addressed to 59 beneficiaries.  Each envelope contained individual checks of unemployment benefits valued at $900.  The total value of all the benefits left on the floor was $54,000.

13.  On March 4, 2021, the EOCTF interviewed Bobby Singh, restaurant owner next-door to the Hacienda business.  Singh said that the space was used as a mail services business, but the space was always closed and two men would open the door once a week to collect mail.  After viewing the same series of photographs show to Pham, Singh identified KARAPETIAN as one of the men who picked up the mail from the Hacienda business.

**KARAPETIAN, POSING AS ASHOT GASPARIAN, OPENED BANK ACCOUNTS USED TO LAUNDER $1.8 MILLION OF EDD BENEFITS INTO GOLD.**

14.  On August 12, 2020, the California Secretary of State recorded the initial business registration for METALOR, 17890 Castleton Street, Suite 303, City of Industry, California 91748. The agent for service of process is Ashot Gasparian ("Gasparian").

15.  From a review of Nikogosyan's digital devices, I learned that on August 14, 2020, Nikogosyan created a plain text note that contained the name Gasparian with PII including date of birth, social security number, telephone number, email addresses with passwords, employment, home address, business address, and account/routing information for financial accounts with Wells Fargo Bank and Royal Business Bank.

16.  The EOCTF obtained numerous records for financial accounts linked to the Erwin Street Crew, including accounts in the name of Gasparian.  A review showed that one Gasparian account received almost $1.8 Million of EDD benefits by wire transfer from Bank of America accounts believed to be fraudulent.  Those benefits were then transferred by wire and check to other financial accounts controlled by Gasparian where funds were used to purchase gold from multiple vendors. Specifically, business records showed the following:

a.  On August 20, 2020, Gasparian opened a Business Checking Account with Royal Business Bank using a $500 cash deposit ("the Gasparian-Metalor RBB account").  Gasparian used the same PII found on Nikogosyan's digital device.  I reviewed a copy of the driver license that Gasparian provided to Royal Business Bank and believe that the person purported to be Gasparian is in fact KARAPETIAN wearing a blue shirt and a brown wig.  On January 26, 2021, the EOCTF executed a search warrant at KARAPETIAN's primary residence in Yorba Linda, California. Seized from KARAPETIAN's vehicle, among other items, were two brown wigs and a Kodak Biometric Passport Photo of KARAPETIAN wearing a blue shirt and brown wig.  The passport photo of KARAPETIAN was the same as the driver license photo purported to be Gasparian.

b.  On August 26, 2020, Gasparian opened two Wells Fargo Simple Business Checking accounts, 7443747733 and 7443747725, under the name Metalor with initial deposits of $200 each ("Gasparian-Metalor WFB account 1", and Gasparian-Metalor WFB account 2", respectively).  Under the Description of

Business was "Buys trash or leftover raw materials from factories."

       c.   A review of incoming wires showed that Gasparian-Metalor WFB account 2 received regular incoming wires from numerous EDD-funded Bank of America accounts that averaged $4,000 to $5,000 each and totaled $1.82 Million. Approximately $1.81 Million was transferred to Gasparian-Metalor WFB account 1 where proceeds were later transferred to the Gasparian-Metalor RBB account or used to purchase gold.

       d.   Approximately $1.5 Million was transferred from Gasparian-Metalor WFB account 1 to the Gasparian-Metalor RBB account with physical checks. The checks were written by hand and identified "Metalor" as the payee. On October 2, 2020, $535,880 was wired from the Gasparian-Metalor RBB account to Swiss America Trading Corporation to purchase 252 one-ounce gold American Eagle coins. Business records from Swiss America Trading Corporation showed that the coins were purchased on October 5, 2020, and shipped to Gasparian at the Metalor business address in the City of Industry. In addition, wire transfers totaling $947,150 was sent from the Gasparian-Metalor RBB account to Suifenhe Yuanwei Economic and Trade Co. Limited ("Suifenhe Yuanwei") in China. According to open-source searches, Suifenhe Yanwei is "a professional foreign trade company which has the right of import and export as well as the border trade between China and Russia." Open-source maps identify the city of Suifenhe, China, as a border city with Russia in China's North-Eastern territory near the city of Valdivostok and the Sea of Japan.

e.    I reviewed business records from JM Bullion, Inc. that showed on September 21, 2020, Gasparian placed an order for 11 one-ounce American Gold Eagle coins for $22,436.70.  On September 22, 2020, $22,441.69 was wired from the Gasparian-Metalor WFB account 1 to JM Bullion. JM Bullion cancelled due to fraud concerns and froze the $22,441.70 wire transfer from Gasparian.

17.  On February 11, 2021, the EOCTF received business records from APMEX, Inc., an online precious metals exchange. After reviewing APMEX records, I learned the following:

a.    On August 28, 2020, Gasparian signed a commercial lease with Puente Hills Business Center for 533 square feet of space at 17890 Castleton Street, Suite 303, City of Industry, California.  Gasparian provided the lease agreement to APMEX as part of their customer review process.

b.     On September 3, 2020, Gasparian created an online account with AMPEX and agreed to the Latest Terms & Conditions via the website.  Gasparian listed his address as 17890 Castleton St, Suite 303, City of Industry, telephone as 909-655-7209 (the GASPARIAN PHONE-1), and email address is metalorusa@gmail.com; the same information previously identified in the note saved by Nikogosyan.

c.    On September 3, 2020, Gasparian placed a mobile order with APMEX to purchase 21 one-ounce American gold Eagles for $43,100.29.

d.    On September 9, 2020, APMEX called the GASPARIAN PHONE-1 and spoke with Gasparian to request a driver license photo, selfie, and proof of address for their files.  I reviewed

the selfie image received by APMEX and believe that the person purported to be Gasparian is in fact KARAPETIAN wearing a brown wig holding the fake Gasparian license ("the KARAPETIAN-Gasparian image").

e.   From a digital device seized from Nikogosyan, I found IMG_0013.jpg that was created and saved on July 27, 2020. The jpeg showed picture of a square-shaped passport photo of KARAPETIAN wearing a blue shirt and a brown wig.  I believe this is the same photograph used to create the fake Gasparian license and displayed in the KARAPETIAN-Gasparian image.

f.   On September 9, 2020, a digital device seized from the residence of Nikogosyan received an instant message sent from telephone number 562-291-7775 to GASPARIAN PHONE-1. Embedded in the message was the KARAPETIAN-Gasparian image.   I believe that this is the same photograph sent by Gasparian to APMEX and that the digital device seized from Nikogosyan is, in fact, GASPARIAN PHONE-1.

g.   On September 11, 2020, Gasparian placed a mobile order with APMEX to purchase five 20-coin tubes of one-ounce American Gold Eagles for $206,039.

h.   On September 15, 2020, Gasparian placed a mobile order with APMEX to purchase 200 one-ounce American Gold Eagle coins for $412,738.  On October 2, 2020, a digital device seized from Nikogosyan captured a jpeg image of an unknown cell phone that displayed transactional information including the debit to APMEX for $412,738.00.  I believe that Nikogosyan used this photo as confirmation of the APMEX purchase of gold coins.

**KARAPETIAN IMPERSONATED AT LEAST 10 VICTIMS TO TAKE OVER THEIR ACCOUNTS AND PROPERTIES, RESULTING IN OVER $5 MILLION IN LOSSES**

18.    After KARAPETIAN was identified as a co-conspirator in the Erwin Street Crew scheme, the Los Angeles Police Department ("LAPD") officer assigned to the EOCTF identified 10 additional victim aliases used by KARAPETIAN to further other criminal schemes in the Central District of California.

| Date | Case ID | Victim Alias | Attempt |
|---|---|---|---|
| January 26, 2021 | | Carlton Wilson | $100,000.00 |
| March 30, 2020 | LAPD 2021-07875 | Kiran Kapadia | --- |
| January 11, 2020 | SPPD 200090 | Walter Quinn | $1,239,274.36 |
| April 8, 2020 | LAPD 2008-07943 | Charles Mitchell | $1,400,000 |
| May 2, 2019 | OCSD 19-017103 | Mohammad Hashemi | --- |
| June 24, 2019 | LAPD 1911-14855 | James Hagerman | $475,235.39 |
| December 16, 2017 | LAPD 1819-04409 | Leon Bates | $124,063.50 |
| August 5, 2016 | LAPD 1608-14280 | Souren Garabedian | $1,300,000 |
| October 7, 2016 | BPD 16-10913 | Rafik Khatchaturian | $720,000 |
| November 23, 2016 | LAPD 1609-20207 | Jeffrey Kabakoff | $160,000 |

19.    From reading the police reports produced by the LAPD, Glendale Police Department, Burbank Police Department, and South Pasadena Police Department, and talking with investigators, I learned the following:

a.    On January 23, 2021, the EOCTF executed a state search warrant at KARAPETIAN's primary residence. Seized from KARAPETIAN's wallet was a forged California Driver's License

bearing a photograph of KARAPETIAN wearing a gray wig and prescription eyeglasses and the name of identity theft victim Carlton Neil Wilson. I verified through department resources that the PII on the license belongs to a real person that is not KARAPETIAN. In 2017, bank records identified numerous internal investigations related to credit card fraud related to "Neil Wilson" with losses in excess of $100,000.

b. On March 30, 2020, KARAPETIAN was arrested by the LAPD for possession of a Forged Driver's License, in violation of California Penal Code 470(B). KARAPETIAN traveled to Kinecta Federal Credit Union at 21440 Victory Blvd, Woodland Hills, California, where he attempted to cash three postal money orders with a total value of $2,900. KARAPETIAN identified himself to the teller as Kiran Kapadia and presented a California Driver's License bearing a photograph of KARAPETIAN wearing a light grey wig. The bank teller recognized the driver's license as fake and called the LAPD. LAPD responded and arrested KARAPETIAN on identity theft charges. I verified through department resources that the PII on the license belongs to a real person that is not KARAPETIAN.

c. On January 11, 2020, the real Walter Quinn contacted the South Pasadena Police Department ("SPPD") alleging that someone had taken out two loans using two of his Pasadena properties, 1121 Meridian Ave and 2111 Hanscom Dr, as collateral. Escrow documents obtained in the SPPD investigation showed that KARAPETIAN purported to be Quinn and directed proceeds from the Meridan and Hanscom equity loans wired into the same Cathay Bank account 0023547464 in December 2019. By

the end of December 2019, $300,000 was wired to California
Numismatic Investments, an online gold dealer in Inglewood,
California, and $886,898 was wired to Suifenhe Yuanwei.  On July
15, 2021, the EOCTF received a victim impact statement from
Stewart Title claiming a total loss of $1,479,572.31.  During
the search of KARAPETIAN's primary residence, the shirt worn by
KARAPETIAN in the Quinn driver license was seized and booked
into evidence.  Based on the shirt and the similarities of the
Suifenhe Yuanwei wire in the Gasparian fraud, I believe that
KARAPETIAN used the stolen Quinn identity to further the fraud.

          d.   On March 2, 2020, KARAPETIAN pretending to be
Kapadia rented 1143 Las Pulgas Place, Pacific Palisades,
California from Charles Mitchell with two cashier's checks drawn
on a Kapadia account at Hamni Bank.  On March 5, 2020,
KARAPETIAN, now pretending to be Mitchell, opened account
5003105161 with Industrial & Commercial Bank of China ("the ICBC
account").  By March 17, 2020, KARAPETIAN, again posing as
Mitchell, met with a public notary at to finalize paperwork for
a $1.4 Million equity loan on the Las Pulgas property.
KARAPETIAN directed proceeds to be wired to the ICBC account
where a series of wires were quickly executed.  On March 25, and
27, 2020, the ICBC account sent two wires totaling $302,156.93
to distributors of LED lights typically used in the cultivation
of marijuana.  On March 26, and 27, 2020, the ICBC account sent
3 wires totaling to First National Bullion totaling $171,900.
On January 26, 2021, during a recorded, non-custodial interview,
KARAPETIAN admitted to using the stolen Mitchell and Kapadia
identities.

e.    Financial records and surveillance video from from Hamni Bank show that KARAPETIAN, posing as Kapadia, opened checking account 550021696 at Hanmi Bank on February 14, 2020, with an initial deposit of $500.  A total of seven deposits totaling $34,700 were made.  On March 2, 2020, KARAPETIAN withdrew two cashier's checks made payable to Charles Mitchell ($25,080.00) and Berkshire Hathaway Home Services ($7,920.00).  I believe surveillance video from Hamni Bank show KARAPETIAN wearing a gray wig, dark moustache, and glasses.

f.    On May 2, 2019, KARAPETIAN walked into a Bank of Hope in Northridge, California, to open a new account.  KARAPETIAN presented the teller with a California Driver's License in the name of identity theft victim Mohammad Hashemi, but bearing a photograph of KARAPETIAN wearing a wig.  The bank teller was familiar with the real Hashemi and identified KARAPETIAN as an imposter.  KARAPETIAN fled the bank and there was no recorded monetary loss. On October 26, 2020, KARAPETIAN was arrested by the LAPD for the Kapadia fraud.  Seized from his person, among other items, was a fishing license in the name of Hashemi.

g.    On June 24, 2019, KARAPETIAN used the identity of victim James Hagerman to obtain a $480,000 equity loan 3755 Griffith View Drive, Los Angeles, California.  From law enforcement reports and escrow documents obtained in the investigation, I saw KARAPETIAN used a California Driver's License in the name of James Hagerman but bearing a photograph of KARAPETIAN.  On April 30, 2019, KARAPETIAN opened US Bank account 157520801463 ("the US Bank Account") under the name

Hagerman with an initial deposit of $50.  Later, on May 30, 2019, KARAPETIAN directed proceeds from the Griffith View loan, $458,271.01, deposited into the US Bank Account.  On June 5, 2019, the US Bank Account made two wires totaling $382,439 to APMEX and Kitco Metals, Inc, two different gold dealers.  By June 11, 2019, US Bank identified the Hagerman account as fraudulent and worked to reverse the wires and minimize the losses.  On June 11, 2021, First American Title advised that the total losses on the Hagerman fraud was $39,469.38.

h.   On January 3, 2018, relatives of Leon Bates called the LAPD to report Elder Financial Abuse.  From law enforcement reports and bank surveillance video obtained in the investigation, I learned KARAPETIAN used a California Driver License in the name of identity theft victim Leon Bates but bearing a photograph of KARAPETIAN wearing a wig. On December 21 and 22, 2017, just three days after Bates passed away from prostate cancer, KARAPETIAN traveled to Beverly Hills, California, and used the forged Bates identification and fraudulent Chase Credit card, 4900 7070 3110 9930, to purchase $124,063.50 worth of luxury watches.  Surveillance video collected inside the watch store at the time of purchase captured a man I believe to be KARAPETIAN wearing a grey wig and glasses

i.   On August 4, 2016, City National Bank ("CNB") Corporate Security Investigations reported to law enforcement a case of client impersonation and identity theft with suspicious amounts of $1,322,200 and losses of $714,600.  From business records obtained in the investigation, I learned KARAPETIAN used

a California Driver's License in the name of identity theft victim Souren Garabedian but bearing a photograph of KARAPETIAN wearing a wig.  On August 4, 2016, KARAPETIAN, pretending to be Garabedian traveled to City National Bank in Brentwood, California, and requested to send $714,600 to China Guangfa Bank and their customer, Suifenhe Yuanwei Economic & Trade Ltd.  On August 8 and 9, 2017, there were two additional failed attempts to send international wires on the CNB account by fax that failed because CNB would not accept the fax orders.  CNB eventually became suspicious of the wires and contacted law enforcement.

j.   On December 7, 2016, Bank of America reported to law enforcement that someone posed as their customer, Rafik Khatchaturian, and attempted to wire $720,000 to a bank in China.  From reading law enforcement reports I learned that on October 5, 2016, the suspect, wearing a wig, presented a face driver's license and asked for help with the wire.  As the teller took several minutes to review and validate the driver's license, the suspect was talking on the phone and appeared to be secretive.  The suspect asked to use the restroom and was informed there was no public restroom.  He then stepped outside and never returned.  I viewed security video collected by Bank of America that captured the suspect at the counter and believe it is KARAPETIAN wearing a wig and sunglasses.  There was no financial loss in this attempt

k.   On November 23, 2016, Bank of the West ("BOW") Corporate Security reported to law enforcement that their customer, Lanker Properties, LLC, was the victim of six forged

checks, totaling $160,110 in losses.  As described below, KARAPETIAN assumed the identity of Jeffrey Kabakoff and assumed his role as a legitimate signer on Lanker Properties, LLC business account at BOW, 040492837.  I reviewed BOW surveillance video and saw KARAPETIAN, posing as Kabakoff, stand at the BOW counter wearing a gray wig and sunglasses.  Further, LAPD Latent Print Unit identified the left middle finger of KARAPETIAN as a match on one of the forged checks.

**KARAPETIAN CONFESSED TO PARTICIPATING IN THE SCHEME**

20.  During the January 26, 2021, search warrant at his primary residence, KARAPETIAN consented to a non-custodial, non-mirandized interview with the EOCTF and LAPD investigators. KARAPETIAN was advised that he was not under arrest and that he could terminate the interview.  The interview, in English, took place inside an a non-marked EOCTF vehicle for privacy and comfort without the assistance of a translator.  I watched a recording of the interview and learned the following:

a.   KARAPETIAN agreed he was in the driver license photos for Hagerman, Mitchell, and Kapadia, and that he was arrested for possession of the Kapadia license.  KARAPETIAN said he opened hundreds of bank accounts during the scheme, and that he participated for money, but he declined to identify or discuss anyone else who was involved.  KARAPETIAN described a conspiracy that began sometime around 2016/2017 and lasted until about October 2020.  KARAPETIAN complained that he was paid too little for the fraud, but described it as "fun."

b.   KARAPETIAN was shown a digital photograph of the KARAPETIAN-Gasparian image that was sent to APMEX on September

9, 2020, and asked "Who took the picture?" KARAPETIAN said that the picture was taken about three months ago by the "driver" of a car "that came to here." The driver later sent the photograph to "someone," and "he took this picture for something to do," but did not know what it was. I believe that the KARAPETIAN-Gasparian image was used to create a fake driver's license necessary further the fraud against Mitchell and purchase gold from APMEX. KARAPETIAN declined to identify or implicate anyone in the conspiracy other than himself.

**The KARAPETIAN STORAGE UNIT**

21. On January 26, 2021, the EOCTF conducted a search warrant at KARAPETIAN's primary residence in Yorba Linda, California. Seized from his residence, among other items, was a receipt from ALLSIZE STORAGE, 17357 LOS ANGELES ST, YORBA LINDA, CALIFORNIA – the business that rents the KARAPETIAN STORAGE UNIT.

22. On August 30, 2021, the EOCTF conducted an interview at ALLSIZE STORAGE, 17357 LOS ANGELES ST, YORBA LINDA, CALIFORNIA. The on-site manager and business records they provided confirmed that KARAPETIAN has been renting the KARAPETIAN STORAGE UNIT since November 9, 2020.

**KARAPETIAN Committed the Fraud While on Pretrial Release**

23. According to police and court records:

a. KARAPETIAN was arrested for the Kapadia identity theft on March 30, 2020. He was granted pretrial release.

b. On April 21, 2020, the Honorable David Yaroslavsky, Los Angeles Superior Court, Van Nuys, issued a $50,000 Bench Warrant for KARAPETIAN after he failed to appear

in person for a hearing related to his arrest for the LAPD investigation of the Kapadia identity theft.

c. As described previously, KARAPETIAN admitted committing the fraud scheme described in this affidavit through October 2020, and so continued to commit fraud even after being arrested for the Kapadia identity theft and while on pretrial release for it.

**The Wealth KARAPETIAN Stole Has Mostly Not Been Recovered**

24. As described above, KARAPETIAN has been instrumental in frauds that have yielded over $18 Million, much of which has been traced to either gold purchases or transfers abroad, at which point I have been unable to follow them further. The overwhelming majority of these fraud proceeds remain at large. Officers on my task force did recover about $230,100 in cash in two safety deposit boxes in defendant's name and that of his wife on January 26, 2021. In my training and experience, criminals often prefer to keep their wealth in cash, gold, cryptocurrency, or foreign accounts to foil law enforcement attempts to locate and recover criminal proceeds.

**KARAPETIAN Leaves No Accurate Public Records Trail**

25. In January 2021, the EOCTF conducted surveillance of Karapetian who was, at the time, living at 2101 Winwood Ave, Las Vegas, Nevada, a property owned by his wife, Anahit Karapetian ("Anahit"). KARAPETIAN was observed driving a white van, Nevada License Plate 016G66 ("KARAPETIAN's old van"), also registered to Anahit. KARAPETIAN told the EOCTF, and public records confirmed, that Anahit sold this property on or about December 15, 2020.

26.  Following the sale of Anahit's property, from May to June of 2021, records show KARAPETIAN's old van in the Spring Valley area of Las Vegas.  No public records could identify KARAPETIAN with a permanent residence in this area.

27.  On July 5, 2021, KARAPETIAN was involved in a traffic collision while driving KARAPETIAN's old van in Van Nuys, California.  In LAPD report 21-1910579, KARAPETIAN indicated his home address was 3701 Tranquil Canyon Court, Las Vegas, Nevada, and his home telephone number was 424-322-7549.  Insurance records for KARAPETIAN's old van identified a second contact number, 702-409-8806, and a registered address of 2101 Winwood St, Apt 2, Las Vegas, Nevada, a property that had been sold six months prior.  A review of public records associated with 3701 Tranquil Canyon Court did not identify any association to KARAPETIAN and numerous efforts by the insurance company to reach KARAPETIAN though his contact numbers were unsuccessful.

28.  On September 1, 2021, KARAPETIAN was scheduled to appear in Los Angeles Superior Court for a preliminary hearing related to the Kapadia fraud.  A physical surveillance of KARAPETIAN identified that he was driving a Honda Odyssey Van bearing a temporary California tag BM18J83 ("the KARAPETIAN ODYSSEY").  Government records show that the KARAPETIAN ODYSSEY was issued permanent license plate 5AWD308, which was only fixed to the front of the vehicle, and registered to KARAPETIAN at 2340 West Acacia Ave, Fresno, California.  A review of public records for 2340 West Acacia Ave did not identify any association with KARAPETIAN.

**KARAPETIAN Actually Resides at 9009 CEDROS AVE, PANORAMA CITY, CALIFORNIA – the KARAPETIAN APARTMENT**

29.   On September 1, 2021, KARAPETIAN drove the KARAPETIAN ODYSSEY from Los Angeles Superior Court to a multi-family apartment complex at 9009 CEDROS AVE, PANORAMA CITY, CALIFORNIA. A review of the public directory posted for the "Cedros-Rayen Apartments" showed approximately 70 named residents, but did not include KARAPETIAN.

30.   On September 1, 2021, based on an affidavit of probable cause, the Honorable Robin Miller Sloan, Judge of the Superior, Northeast Judicial District of California, authorized a search warrant for the installation of a GPS tracking device on KARAPETIAN's Odyssey.  Beginning on September 1 and ending on September 30, 2021, the EOCTF monitored data from the KARAPETIAN ODYSSEY which showed it made multiple stops near KARAPETIAN STORAGE UNIT and stopped near the KARAPETIAN APARTMENT most of the days in September, including the following:

a.   On September 3, 2021, at approximately 1:15 PM, the KARAPETIAN ODYSSEY stopped for about 15 minutes near the KARAPETIAN STORAGE UNIT.

b.   On September 28, 2021, at approximately 4:45 PM, the KARAPETIAN ODYSSEY stopped for about 60 minutes near the KARAPETIAN STORAGE UNIT.

c.   On September 9, 2021, the EOCTF conducted a surveillance at the "Cedros-Rayen Apartments," 9009 CEDROS AVE, PANORAMA CITY, CALIFORNIA.  At approximately 11:00 a.m., KARAPETIAN was seen exiting the driver's side door of the KARAPETIAN ODYSSEY and unload several items from the back of the

Odyssey onto a rolling cart.  KARAPETIAN then rolled the cart into the "Cedros-Rayen Apartments," rode the elevator to the second floor, and then entered the KARAPETIAN APARTMENT with the cart.  That is, your affiant personally watched KARAPETIAN enter APARTMENT 218.

Training and Experience on the Target Offenses

31.  In my training and experience, members of fraud conspiracies must of necessity maintain evidence of their frauds, such as the contact information for their co-conspirators and communications with them, and notes and records regarding accounts used in the fraud and the laundering of the proceeds.  Commonly they maintain this evidence where they believe it is safe and close at hand, most often in their residences, automobiles, and especially since the advent of smartphones, on their persons.  Indeed, as described previously in this affidavit, earlier search warrants on KARAPETIAN's previous vehicle and previous residence yielded wigs and clothing used in the fraud.  Additionally, earlier search warrants on KARAPETIAN's digital devices yielded evidence and communications with known co-conspirators regarding money laundering and identity theft.

32.  In my training and experience, fraudsters pursue their crimes to support their lifestyles, and therefore do not generally stop unless arrested.  Indeed, as described previously, KARAPETIAN did not stop his fraud even after he was arrested, and continued to pursue it even when he was released on fraud charges.

**TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

33.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.   For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.   Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.   Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

34.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.   Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.   Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

35.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

       c.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb and/or fingers of HARUTIUN KARAPETIAN on the device(s); and (2) hold the device(s) in front of his face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

36.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

**CONCLUSION**

37.  Based on the facts described above, there is probable cause to believe that HARUTIUN KARAPETIAN violated 18 U.S.C. Sections 1344, 1349, and 1028A, and that the items listed in Attachment B are evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, and will be found at the SUBJECT PREMISES.


Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this  20th day of October,
2021.


_____
UNITED STATES MAGISTRATE JUDGE
ALEXANDER F. MACKINNON